UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                             Case No. 17-CR-57

JOEL RIVERA,

        Defendant.

## UNITED STATES' SENTNECING MEMORANDUM

      The United States of America, by its attorneys, Gregory J. Haanstad, United States Attorney for the Eastern District of Wisconsin, and Carol L. Kraft and Benjamin A, Wesson, Assistant United States Attorneys, hereby submits the following memorandum in advance of sentencing. The purpose of this sentencing memorandum is to highlight aspects of Rivera's conduct and history beyond that which is included in the presentence report (PSR), including Rivera's lengthy history of criminal conduct.

      On March 21, 2017, a grand jury sitting in the Eastern District of Wisconsin returned a 10-count indictment charging Joel Rivera with five counts of Hobbs Act Robbery in violation of Title 18, United States Code, Section 1951 and 2 and five counts of possessing and brandishing a firearm in furtherance of a crime of violence, in violation of Title 18, Section 924(c).

      On September 27, 2017, after a six-day trial, a jury found Rivera guilty of the robbery offenses charged in Counts 7 and 9 of the indictment and the corresponding firearms offenses charged in Counts 8 and 10 of the indictment. The jury acquitted Rivera of the robbery offense charged in Count 1 and the firearms offenses charged in Counts 2 and 4. The jury was unable to

reach a verdict on the robbery offenses charged in Counts 3 and 5, and the firearms offense charged in Count 6.

Each of the two robbery convictions carries a maximum statutory penalty of 20 years imprisonment and a $250,000 fine. The two firearms convictions carry mandatory consecutive sentences-count 8, a sentence of 7 years, and count 10, a sentence of 25 years, for a total consecutive sentence of 32 years. Each firearm charge also carries a maximum fine of $250,000.

On November 14, 2017, the probation department disclosed a Presentence Report (PSR) that calculated Rivera's adjusted guideline offense level at 35. The calculation was based on the two robbery counts of conviction (counts 7 and 9), and relevant conduct that included the robbery count for which Rivera was acquitted, and the two robbery counts for which the jury was unable to reach a verdict (counts 1, 3 and 5). Rivera was determined to have a criminal history score of III, resulting in a recommended advisory guideline range of 210 to 262 months.

On December 4, 2017, Rivera filed objections. He denied responsibility for the counts of conviction, objected to the relevant conduct calculations, and maintained that at most, the adjusted offense level should be 22 with a resulting guideline range of 51 to 63 months. The government responded that the PSR is correct as written.

For the reasons set forth herein, the government respectfully requests the court to impose a total sentence of 594 months (49.5 years), consisting of a low guideline sentence of 210 months (17.5 years) for the two robbery offenses and a consecutive 384 months (7 years plus 25 years) for the firearms offenses.

I.  ARGUMENT

The sentence that this Court imposes should be sufficient, though not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, adequately

punish the crimes committed, deter other criminal conduct, protect the public from the defendant, and provide for any particularized needs of the defendant. U.S.C. 3553 § (a)(2). In determining the appropriate sentence, this Court must consider each of the factors set forth in 18 U.S.C. §3553(a). *United States v. Harris*, 490 F3d 589, 593 (7th Cir. 2007). In addition to the goals set forth above, these factors include the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences that are available; the Sentencing Guidelines range; the policy statements of the Sentencing Commission pursuant to Title 28, United States Code, Section 994(a)(1); the need to avoid unwarranted disparities among similarly situated defendants; and the need to provide restitution to the victims. 18 U.S.C. §3553(a). This approach is applicable whether the Court is determining a sentence for a single offense or an aggregate sentence for multiple offenses, including offenses that carry a mandatory minimum and the predicate offenses thereto. *See Dean v. United States,* 137 S. Ct. 1170, 1176 (2017).

Simply put, courts should impose sentences that take a holistic view of a defendant's characteristics and conduct, as well as the impact of that conduct on the community. In doing so, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited as to the kind of information he may consider, or the source from which it may come." *United States v. Jones*, 635 F3d 909, 917 (7th Cir. 2011) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972). This principle is echoed in 18 U.S.C. § 3661, which states that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also* 18 U.S.C. § 3553(a)(1) (directing consideration of the "history and characteristics of the defendant"). "The facts that a sentencing judge finds in determining

3

what sentence to impose-such facts as the defendant's criminal history, his cooperation or lack thereof in the government's investigation, and his remorse or lack thereof-need be found only by a preponderance of the evidence." *United States v. Horne*, 474 F3d 1004, 1006 (7th Cir. 2007).

The United States submits that a total sentence of 49.5 years imprisonment would appropriately address the factors set forth in 18 U.S.C. §3553(a)-specifically, the nature and circumstances of the offenses, the history and characteristics of the defendant, just punishment and promotion of respect for the law, and protection of the public from further criminal conduct by this defendant.

### A. The Nature and Circumstances of the Charged Offenses

The offenses are very serious. Rivera was convicted of two armed robberies that were part of a five-robbery crime spree that began on January 4, 2017 at the Los Gallos restaurant and continued until January 17, 2017. The evidence produced at trial demonstrated that Rivera was the mastermind of this crime spree, that he provided both the transportation and the firearm that made these offenses possible, and that he had no reservations about the degree of violence visited on the terrified victims. Indeed, all of these robberies, including the two that were the subject of conviction were extremely violent offenses. And if there was any question that Rivera was on board with the use of violence from the outset, that question was resolved by his conduct at the January 5, 2017 Arandas restaurant robbery. There, surveillance video shows Rivera directing others to comply with his co-actor Antonio Thomas who was wielding a firearm, and forcibly pushing people to the floor. After observing Thomas' display of aggression at Arandas, Rivera nonetheless continued to arm him and facilitate robbery after robbery. Rivera not only, tolerated, but encouraged Thomas' aggressive conduct while he carefully played a role that would provide him with maximum cover for these crimes.

4

Case 2:17-cr-00057-PP   Filed 12/29/17   Page 4 of 17   Document 104

Without question, these robberies were extremely serious and the defendant's role was instrumental to their success. Accordingly, as the underlying predicates for the 924(c) offenses, the robbery convictions deserve a separate, substantial consecutive sentence.

### B. The History and Characteristics of the Defendant

Rivera has a long history of criminal conduct including many similar offenses. As an initial matter the PSR reflects numerous juvenile contacts going back to age 14 including adjudications for Resisting/Obstructing/Disorderly Conduct, Receiving Stolen Property, Fleeing, and Delivery of Controlled Substance-Marijuana. The latter two cases resulted in a placement at Ethan Allen School for Boys. As a juvenile, Rivera also had arrests for truancy, criminal damage to property, loitering, and disorderly conduct.

The PSR also reflects a significant history of adult criminal contacts. On February 15, 2007, Rivera was arrested for First Degree Reckless Injury and Felon in Possession of a Firearm, offenses that had occurred on October 4, 2006. At the time of this arrest, Rivera was already in custody for an armed robbery that he committed with two others at the Roberts Restaurant, 4301 South Howell on January 22, 2007. The Reckless Injury/Felon in Possession Case and the Roberts Restaurant Robbery Case were issued consecutively on January 25, 2007 as Milwaukee County Criminal Case No. 07- CF- 476 and Case No. 07- CF- 477. As the PSR reflects, Rivera was acquitted of the Reckless Injury and Felon in Possession charges following a jury trial, despite the fact that the victim identified him and testified against him at trial. Rivera pled guilty to the Roberts Restaurant robbery where the evidence included his fingerprints on the restaurant cash box. Rivera would later tell an acquaintance that he was caught because of the fingerprints. After he was incarcerated for the Roberts Restaurant Robbery offense, Rivera was implicated in an attempt robbery and felony murder that occurred at Marty's Party Bar, 3735 West National

5

Avenue, Milwaukee, Wisconsin on January 7, 2007. As a result, he was charged with First Degree Intentional Homicide, Felony Murder and Armed Robbery in Milwaukee County Criminal Case 08-CF-6314. This case was dismissed at the preliminary hearing. As noted in paragraph 86 of the PSR, Christian Colon, the co-actor who was expected to testify against Rivera, backed out after the two were inadvertently placed the in the same holding cell before the hearing.

Rivera remained incarcerated for the Roberts Restaurant robbery until January 17, 2012, when he was released from prison on extended supervision. On August 16, 2013, while on supervision, he committed an attempted armed robbery at the Concertina Bar, 1930 South 37th Street, Milwaukee, Wisconsin. During this offense, one of his co-actors, Carmelo Matos-Arzola, was killed and a second co-actor, Jose Munoz, was injured when a bar employee produced his own gun and fired at the armed robbers. Rivera was charged with Felony Murder and Attempt Robbery in Milwaukee County Criminal Case No. 14 - CF-129. His supervision was revoked on April 24, 2014, but again he was acquitted of the criminal charges when on August 29, 2014, a jury found him not guilty.

Notwithstanding Rivera's acquittals, the Court should consider the allegations in the Marty's Party Bar and Concertina robberies along with evidence of his participation in other uncharged robberies and attempted robberies in determining an appropriate sentence in this case. Rivera has confided to others that he was involved in both the Marty's Party Bar and Concertina offenses, and information obtained during the investigation of other matters, confirms his long history of serious criminal conduct beyond the offenses of conviction.

In August and September 2014 proffers, federal defendant Jesus Arroyo-Santiago, aka Nene Santiago, admitted to committing approximately 30 armed robberies in Milwaukee and

Racine.[1] During his debriefs, Arroyo identified the persons who were his accomplices in the commission of those robberies including Joel Rivera and Rivera's brother, Ramon Enrique Rivera, and others that were part of an ongoing robbery crew.[2] Reports summarizing Arroyo's debrief statements as they relate to Rivera are attached as Exhibits 1 and 2. Interestingly, Arroyo stated that in a prelude to many of these robberies, they would send their girlfriends in to conduct surveillance, and have the girls make small purchases to avoid suspicion. Rivera employed a similar tactic in this case, when at Arandas and Subway, he preceded Thomas into the restaurant and, intending to provide backup, he purchased small items, while pretending to be merely a patron.

As to Joel Rivera, Arroyo stated that he met Joel in 2010 through his brother Ramon while Arroyo and Joel were both incarcerated at the Racine Correctional Institute. While they were incarcerated, Joel told Arroyo that he had "gotten away" with a homicide case, that during a robbery in a bar he "had to shoot someone." In fact, this admission is consistent with the evidence of the Marty's Party Bar homicide which occurred in January 2007. As reflected in paragraph 86 of the PSR, Christian Colon, who failed to testify against Rivera after the two had been inadvertently placed in the same holding cell, told police that Rivera shot a patron of a bar that they were trying to rob because he thought the patron was going to kill Colon.[3] The criminal complaint in the Marty's Party Bar case provides even more information. The complaint is attached as Exhibit 3. It reflects that in his statement to the police, Colon stated that on the date

---

[1] Arroyo was charged in June 2014 in Case No. 14-CR-126, with two counts of business robbery in violation of 18 U.S.C. §1951, one count of discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §924(c), one count of brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §924(c), and one count of being a felon in possession of a firearm in violation of 18 U.S.C. 922(g)(1) and 924(a)(2). He pled guilty but committed suicide before sentencing.

[2] Ramon Rivera and other persons identified by Arroyo were charged with a robbery conspiracy and multiple substantive counts of robbery and 924(c) in federal court Case No. 15-CR-51. That indictment alleged a total of 19 robberies, including a December 22, 2014 robbery at the 13th Street Family Dollar and a January 10, 2015 robbery at Tacqueria Aranda. All of the defendants pled guilty and as reflected in paragraphs 107 and 108 of Rivera's PSR, Ramon Rivera and Rivera's two half-brothers, Jose and Joshua Gonzalez were all sentenced to prison for their role in those offenses.

[3] Colon pled guilty to felony murder and several unrelated robberies.

7

of the attempted robbery he had gone to see Rivera at a home on 8th and Lapham where people he knew "hung out." Rivera spent a lot of time at the residence and Colon went there because he wanted to borrow money from Rivera. At the residence, Colon found Rivera and a 14 year-old boy who Rivera was helping to "mentor." Rivera told Colon that he didn't have any money, but said, "Come with me, I'll get you some." Colon knew that Rivera had been doing a lot of robberies since he met a man Colon called "Daablo," several months earlier. Colon also knew that Rivera had a large semi-automatic handgun that he had been carrying for quite some time. Rivera told Colon to get a gun and come with him. Colon knew that Melany[4] and Mike kept a "house gun," which "everyone was using for robberies, especially Daablo." Colon was able to find a black BB gun and he then left the house with Rivera and the 14 year-old. Colon was driving a green Mercury van and Rivera and the 14 year-old were his passengers. Rivera wanted to go to a particular bar on National Avenue. Colon identified a photograph of Marty's Party Bar as the bar Rivera had selected. Rivera said something about knowing the owner. Colon parked the van a couple of blocks south on 37th Street and they walked back to the tavern. Before going in, they agreed that Colon would demand money from the lady bartender and the 14 year-old would take the cash out of the register. Rivera told Colon that he would stand at the door as a lookout "in case anything happened." Rivera said, "I'll be at the door, if anything moves, leave it to me." Colon said that he and the 14 year-old walked all the way to the back of the tavern, and he pointed the BB gun at the occupants. Either Rivera or the 14 year-old yelled, "This is an armed robbery, get down on the floor." Colon pointed his gun at the female bartender and told her to open the register, then peeked into the rear poolroom. Colon then shouted to Rivera,

---

[4] Emily Zayas has identified Melany or Melanie as a friend of Rivera's. She is the person who was present when the police came to execute their first warrant at 5824 North 93rd Street. She helped Rivera burn evidence in the bathroom. Wisconsin Circuit Court Access reflects that 7/9/2007, Melanie M. Dejesus was convicted in Case 2007CF1588 of keeping a drug house at 1559 S. 8th Street, and was sentenced to one year HOC stayed, 2 years probation.

"Don't shoot, there's no one else in there." At this point, an older white man began to get off a bar stool and step toward Colon. The man was holding what appeared to be a knife. The man was moving slowly and appeared to be drunk. Colon did not feel threatened and he was able to run around and past the man. Colon saw that the man had turned as though to follow him and as he got to the door of the tavern, he heard a shot. As he stepped down the front steps, he heard a second shot. Colon and the 14 year-old ran to the van, followed seconds later by Rivera, who told Colon that he shot the victim because, "He was going to kill you." Subsequent investigation showed that the victim had been shot twice, once in the chest and once, in a though and through shot, in the arm. He died of the gunshot wounds. Police recovered two 9mm casings near the front door and just outside, and recovered a bullet jacket and lead core inside the tavern. The victim had been holding a paint scraper.

In addition to telling authorities about Rivera's admission to the bar murder, Arroyo identified Rivera as his co-actor in two robberies and one attempted robbery that occurred after they both got out of jail. He also related information about Rivera's involvement in other robberies, including the Concertina Bar robbery where Carmelo Matos-Arzola was killed. With regard to his personal experience with Rivera, Arroyo said that two of the offenses occurred in Racine and one occurred in Milwaukee's Bay View neighborhood. Police identified the Racine establishments as the Brass Monkey Bar at 1436 Junction Avenue, Racine, and the Quick Stop Foods, 1600 Martin Luther King Drive, Racine. As to the robbery at the Brass Monkey, which occurred on January 16, 2013 at 10:44 pm, Arroyo stated that he and Rivera drove to Racine in a vehicle owned by a woman he knew as "Katty." When they approached the bar, he looked in and saw two or three patrons. He and Rivera put on bandanas and clear latex gloves. Arroyo had a .22 caliber handgun and Rivera had a shotgun with a sawed off stock, but no ammunition.

Arroyo went in first, announced a robbery and demanded money from the cash register. Rivera confronted a man seated on a stool with the shotgun. Arroyo told a Hispanic woman who he believed to be Mexican to open the register. (In his original statement, Arroyo told authorities that he believed that this robbery was at a Mexican restaurant.) Witness statements corroborated Arroyo's account of this robbery, although the witnesses did not describe the second suspect (Rivera) as having a shotgun.

As to the offense at the Quick Stop Foods, which occurred on January 19, 2013, at 6:28 pm, Arroyo said that he and Rivera drove Katie Padilla's green Honda CRV to Racine, looking for a place to rob. Most stores were closed so they chose a corner grocery store. They had on bandanas and gloves and Rivera had the .22 caliber gun that had belonged to Edgar Padilla. Arroyo went in first and announced a robbery. An older Middle Eastern man and an older Middle-Eastern woman were behind the counter and a younger Middle-Eastern man was in the back. The older man was reaching under the counter as if for a gun and the woman swung a broom at Arroyo but missed. Rivera then pulled out the gun, pointed it at the older man, and pulled the trigger. Nothing happened. He and Rivera fled, and as they were driving back to Milwaukee they realized the clip was missing from the gun, and must have fallen out. Arroyo's account was corroborated by witness statements and by the fact that following this attempted robbery, a loaded magazine and a live round for a .22 caliber gun was recovered just outside the entrance to the store.

Arroyo also described a robbery that he committed at a Bay View bar with Rivera, Carmelo Matos-Arzola, who was later killed at the Concertina Bar, and another individual he identified as Lazaro. Arroyo stated that this robbery occurred after he returned from a trip to Massachusetts and he called Rivera to pick him up at the train station. Rivera and Carmelo were

10

discussing doing a bar robbery for which they would need more than two people. They needed two to come in the front door and two to come in the back. Rivera had the shotgun with the sawed off stock and Arroyo had a 9mm pistol that Rivera borrowed from a person named Choco. Carmelo and Lazaro had BB guns. The plan was for Carmelo and Arroyo to come in the front door and Rivera and Lazaro to come in the back door. When they got to the bar, Arroyo and Carmelo came in the front door, but Rivera and Lazaro didn't come through the back. Carmelo got the cash from the register and Arroyo took a purse from a girl at the bar, and then they left. Later they learned that Rivera and Lazaro had encountered two people who were smoking at the back door and had robbed them first, then came in and robbed the rest of the patrons after Carmelo and Arroyo left.

Arroyo said that after this robbery, he returned to Massachusetts and while there, he received a call from a woman named Liliana Lorenzo.[5] She informed Arroyo that she had been at the home of a man named JC, identified as Jose Manuel Cruz, when Rivera and little JC, identified as Jose Hernando Munoz, came back after the robbery of the Concertina Bar. Lorenzo told Arroyo that little JC had been shot and Carmelo had been killed at the bar. JC got his girlfriend and Rivera got his girlfriend and they took little JC to a Chicago hospital.

All of this information is consistent with facts set forth in the criminal complaint for this offense. This complaint is attached as Exhibit 4. The complaint contains the statement of Jose Munoz who is little JC and who, on the date of the Concertina Bar offense, was treated at a Highland Park, Illinois hospital for two gunshot wounds. Munoz stated that he had been in a car with Rivera and Carmelo Matos-Arzola when bandanas, BB guns, and plastic gloves were being distributed. Both Rivera and Matos-Arzola told him that he only had to go into the bar and show

---

[5] Lorenzo is one of the defendants charged with Rivera's brother Ramon in 15-CR-51.

11

the gun and they would take care of the rest. Munoz went into the bar first, flanked by the other two and they all had their guns displayed. He remembered that the bartender produced a handgun and Matos-Arzola said, "Don't try it, don't do it." The bartender started to shoot and he saw Matos-Arzola fall. As he was trying to get away, he realized that he had been shot. He last remembered going to Rivera's girlfriend's house and being taken to the Illinois hospital.

The complaint also contains a statement of Darlene Lomeli who told police that on August 16, 2013, she received a call from Rivera who asked her to help take his uncle's son to the hospital. Rivera came to her residence and they drove to a location where she picked up Munoz and Rivera's uncle. The uncle told her not to take Munoz to a hospital in Milwaukee, so she drove to Illinois. While they were driving, she heard the men talking about Carmelo, saying that he had been shot, that they were sorry they had to leave him, and that they hoped he was okay.

In addition to the aforedescribed information, Arroyo, told authorities that after his release from prison for the Roberts restaurant robbery, Rivera committed two home invasion robberies for drugs with a fellow Spanish Cobra member Edgar Padilla. Padilla had been apprehended and convicted, but had never implicated Rivera. The Wisconsin Court Access Records reflect that in fact, Edgar Padilla, Jr., was convicted of two counts of armed robbery on June 25, 2013 and was subsequently sentenced to 14 years in prison.

Rivera also made statements about his previous criminal conduct to his co-defendant Antonio Thomas. He told Thomas that he did "bar robberies," and that on one occasion when he robbed a bar with two others, "one was shot and one died" and that "he and the other" robber went to a hospital in Chicago. This is a description of the Concertina Bar events, and are facts that Thomas would not have known but for Rivera's telling.

12

In addition to his long criminal history, Rivera's conduct at the Waukesha County Jail during the pendency of this case sheds important light on his character. On three separate occasions, Rivera made threats to correction officers with whom he took exception, further demonstrating that he has no regard or respect for rules or the people who are charged with enforcing them. See Waukesha County threat report attached as Exhibit 5.

In summary, there is substantial information upon which this Court can conclude that Joel Rivera has made a career of armed robbery, that he is without remorse for his past and present crimes, and that he is a threat to the community. He is a very dangerous individual deserving of substantial prison time.

### C. Promoting Respect for the Law and Providing Just Punishment

As noted, Rivera's history and conduct demonstrate that he has no respect for the law. Rather than learning from his prior incarceration or being humbled by his various acquittals, Rivera has merely become emboldened and more cunning in the execution of his on-going criminal conduct. Upon his release on supervision following his first robbery conviction, he dove right back into the same conduct. After his friend and co-actor was killed during the attempted robbery at the Concertina, he didn't reform, he merely became more careful. In the instant case, he orchestrated five robberies with Thomas as the front man and the fall guy. In doing so, he took advantage of a young man who he knew to be homeless, troubled, and vulnerable on many levels. Yet he had no compunction about making Thomas the face of these robberies while he pretended to be merely a casual customer, confident that in doing so he would not leave a trail of evidence implicating him.

Throughout his jail calls, in conversations with his mother and others, Rivera repeatedly asserted his confidence that he would be acquitted of the charges, not because he is innocent, but

13

because he had planned and executed the robberies in a manner that left no tangible evidence.

In a March 8, 2017, jail call with a man named Cesar, Rivera stated:

> As they say, "I ain't [sic] gonna lie," Tio. This-this is only temporary, bro. These people … nothing, bro. It's like this, this is the case where I can tell you, uncle, "I really didn't did [sic] s--t wrong." [chuckles] I really didn't did s--t wrong, dog. Nothing wrong, bro. Nothing! [pause] No finger prints, no DNA, no gun, no none of … none of … and these people—

When Cesar responded, "They got that black nigger--- though." Rivera interjected, "Just want to f--k with me and stuff. They just want to f--k with me and my baby, dog." Cesar repeated, "They have that black dude." But Rivera was dismissive, stating that Thomas had been in court with him and he had told he authorities that he didn't even know him. In a later call with his mother, Rivera again dismissed the possibility that Thomas' testimony could be an impediment to his acquittal. Rivera told her that he didn't think that the "black guy who was snitching" against him could be used against him because the "guy has some kind of problem," but even if "they could use him to testify," Rivera would beat the case, because they "have nothing on me," only me "buying stuff." He was also dismissive of others who had implicated him in his previous crimes, saying, "All of those people like Little JC (Munoz), Christian (Colon), or Nene (Arroyo) who tried to bury me never succeeded and had to deal with their own jail time or suicides." Rivera concluded that he wasn't worried and would never accept a plea.

In summary, not only is Rivera a career criminal in the most basic sense of that term, but he has demonstrated that he is wholly without remorse. Past consequences have not rehabilitated him nor taught him any respect for the law. Rather, he has become a more cunning, emboldened, and skilled criminal. He believes he is untouchable. Only a substantial prison sentence will provide just punishment and promote respect for the law.

### D. Providing Adequate General and Specific Deterrence

18 U.S.C. Section 3553(a)(2)(B) requires the sentencing court to consider the need for the sentence imposed to afford adequate deterrence to criminal conduct, a sentencing factor based on Congressional belief that sentences influence behavior. *See United States v. Goldberg*, 491 F3d 668, 672 (7th Cir. 2007); *United States v. Newman*, 965 F2d 206, 210 (7th Cir. 1992).

In *Newman*, the Court discussed deterrence in relation to a con man who the Court deemed to be a successful con man, successful in the sense of one who is rarely caught and would therefore have a strong incentive to resume his life of crime when he is released from prison. The court opined, "Since punishment is discounted by the probability of it being imposed-even a criminal of minimal rationality will prefer to commit a crime that carries a mandatory life sentence if the probability of his being caught and punished is .01 rather than .99- a skillful criminal requires a longer sentence than an inept one in order to be deterred from committing future crimes." *Newman, supra* at 210.

Like the con man in *Newman*, Rivera has shown himself to be adept at his life of crime. He committed robbery after robbery and to date, he has escaped any substantial punishment. And he has yet to be deterred. Accordingly, in this case, a substantial sentence is clearly warranted.

### E. Protecting the Public from Further Crimes by the Defendant

The recurring theme in Rivera's life is that he won't stop committing armed robberies. Past efforts at deterring him have been wholly unsuccessful. Neither prison, nor the death of his co-actor friend have served to deter him. He appears to be a man with no moral compass or capacity for remorse or reflection. It is apparent that only a long prison sentence will incapacitate him and adequately protect the public from future similar conduct.

15

**II. CONCLUSION**

For the reasons set forth above, the counsel for the United States believe that a total sentence of 49.5 years is sufficient but not greater than necessary and will satisfy the goals of sentencing as set forth in Section 3553(a). Specifically such a sentence will promote respect for the law, provide just punishment, create deterrence, and protect the public. Counsel for the United States will make additional remarks at the sentencing hearing.

Dated this 29th day of December 2017.

Respectfully submitted,

GREGORY J. HAANSTAD
United States Attorney

By:

*s/ Carol L. Kraft*
CAROL L. KRAFT, WBN 1000117
BENJAMIN A. WESSON, WBN 1061306
Assistant United States Attorneys
517 East Wisconsin Avenue, # 530
Milwaukee, WI 53202
Telephone: 414 297-1700
FAX: 414 297-1738
carol.kraft@usdoj.gov